## PALATO v. INTERNATIONAL SILVER CO.

(Circuit Court, D. Connecticut. April 21, 1904.)

### No. 543.

1. MASTER AND SERVANT—INJURY OF SERVANT—NEGLIGENCE OF FELLOW SERVANT.

Evidence considered, and *held* to show that the injury of an employé by the falling of the ram of an hydraulic press, which he was assisting to repair, was not due to any defect in the appliances used, nor to the incompetence of a fellow servant, but, so far as appeared, to his negligence, for which the master was not liable.

At Law.

Canfield & Judson, for plaintiff.
Seymour C. Loomis, for defendant.

PLATT, District Judge. This is a hearing in damages after default, under the state practice, in an action by Louis Palato to recover $3,000 damages for injuries which he claims to have suffered from the negligence of the defendant, transferred from the state court for diversity of citizenship.

Having heard the evidence, I find the following facts:

On June 6, 1903, at the defendant's factory, in Derby, Conn., a certain hydraulic press became out of repair, and required repacking. The plaintiff had for many years been employed upon that press, and at times upon a smaller one in the same room. Each press had required repacking about once in six months, and the plaintiff had been present at and taken part in nearly all such repackings, and was thoroughly experienced in all the details connected therewith. A necessary part of such work was to lift out the ram or plunger which was used in connection with the dies in stamping out the metal blanks. The ram was

circular in form, with a diameter of about 17 inches, about 17 inches in height, and weighed about 1,000 pounds. When in use, it was raised by hydraulic pressure so that its upper surface reached the head of the press, and then, by removing the upward pressure, was permitted to fall of its own weight upon the die below. The lower face of the ram, when so raised that its upper surface reached the head of the press, had a fall of about 11 inches before it reached the face of the die, which was set in a cylinder of practically the same diameter. Whilst the work of repacking was going on, the ram was controlled by a block and falls. The way of it was this: Above the room in which the press stood was a small attic room, called the "fanroom." That room was used to get the height necessary for the action of the lifting apparatus. There was a trapdoor immediately over the head of the press. A pulley was securely fastened by an eyebolt screwed into the ceiling of the fanroom. This could be raised and lowered somewhat, and, in addition, a chain could be suspended from a hook at the lower part thereof. The chain was dropped down through the trapdoor, and through a circular opening in the head of the press, a trifle larger than the chain, into a like opening in the ram, where it was fastened by a crossbar of steel. The length of this chain was then governed by a hitch made over the hook suspended by the pulley. In each instance of repacking, the play of the pulley not being sufficient for the purpose, several hitches were made up in the fanroom—sometimes three, sometimes four, depending upon the number of times it was necessary to carry the ram away from its central location, and toward the edge of the press or beyond. The vitals of the case center around this hitch.

I will now describe briefly the actual proceedings on the day of the accident: Edward J. Welch was the foreman in charge of the hydraulic press work. It is conceded that he had not at the time sufficient experience to have attended to the hitches himself. He put several men at work on the repacking. Abram N. Burke was put in charge of making the hitches in the fanroom above. Palato and others worked on the press in the room below. The ram was lifted out and taken to one side, and then brought back several times; Burke attending to the hitches in the fanroom. At last, while the ram was resting upon a circular board, about two inches in thickness, placed over the cylinder, the chain being still fastened to the ram by the steel bolt, the signal was given to Burke to lift the ram toward the head of the press by the pulley. Just before that Palato says that he thought he saw a vibration, and asked if the hitch was solid. Burke called out that it was all right, and the ram was lifted from its resting place. At the instant when it reached the head of the press, Palato reached under the ram, with oiled waste in his hand, and began to wipe off the undersurface of the ram. As he did so, the ram fell upon the circular board, and mangled his arm from the wrist to the elbow. Fortunately the ram began to tip sideways when it came upon the board, and, with Welch's assistance, the weight was removed from Palato's arm.

No bones were broken, but the contusion was serious; and, in discussing the extent of the injury, the plaintiff claims that the nerves were seriously and probably permanently injured, so that the arm can never be used again with its normal power, and the defendant insists

that the injury was mainly in the ligaments and muscles, which have practically recovered their normal use, and that he is on the high road to full recovery. In that part of the case, it was important to establish the existence of a certain bony growth near the elbow socket, and, as bearing upon that question, certain X-ray pictures, called "skyographs," were admitted in evidence.

The case turns upon the kind of hitch which it was safe to use, upon Burke's competency to make the hitch, and upon Palato's carelessness in reaching his arm under the ram to wipe it, when the situation an instant before had been such as to suggest to him that the danger was approaching which did in fact reach him in the twinkling of an eye. Burke was in the fanroom alone, and made the hitches. He made the hitch in this way: A link chain of sufficient strength, 6 feet and 9 inches long, having been attached to the ram below as heretofore described, was thrown over the hook in such a manner that the chain was supported by the hook above its heel, and crossed in the dip of the hook below and opposite; the free end falling first across the dip, and the weight-carrying portion lying upon the free portion. By this simple device, it is evident that, owing to the force of friction, the chain can carry the full weight of its capacity, and, the greater the weight, the greater the security. It is a well-known hitch, in common use among practical engineers and mechanics, called the "Blackwall Hitch," and can be found described in any well-known text-book touching on such matters. It is easily understood by a man of fair intelligence. I find as a fact that the hitch used was a proper one in the circumstances, and that Burke was a competent man to be employed in making it. His experience with the hitch was sufficient, and the master was not negligent in intrusting the management of it to him. Palato had made hitches in former years, but, owing to the loss of some fingers about four years before the accident, had been forced to desist. One Silvester had also attended to the hitches on many prior occasions. Both of these men gave evidence that in making the hitches they had always used a double hitch, to wit, had thrown the chain twice around and above the heel of the hook, which they insisted increased the security of the fastening, but I am unable to accept their statements as true. The surrounding and underlying facts and circumstances belie the statements as to the way they had made the hitch, and it is not apparent that absolute security, or even that better security, would result from the double hitch. Burke testified that he made the hitch as he had made it on several former repackings, and as he had seen Silvester and Palato make it. I am entirely satisfied, from the appearance of the witnesses, and from their manner when testifying, and from other evidence, and from the general situation, that Burke told the truth when he so testified. All the appliances are conceded to have been proper, and I find that Burke was fit and competent to adjust the appliances.

It is contended that the single hitch is unsafe when the tension is not uniform, that the evidence in this case shows clearly that the tension was not uniform, and that therefore its adoption makes the master liable. The difficulty with that contention is this: It is proven, and I find as a fact, that after each hitch was made the tension was uniform— varying, it is true, in intensity, but existing nevertheless to some ex-

tent—until the next occasion arose for carrying the ram away from its central position. Then the chain was loosened to permit the removal, but upon its return a new hitch was necessary, and from that time no sufficient lack of tension could exist to enable the chain to slip below the heel of the hook if adjusted above the heel. At the time of the accident it had served to lift the ram upward some 11 inches from its resting place. The single hitch was adaptable in the circumstances, and beyond valid criticism. The trouble came, not from the character of the hitch, but, if the evidence points to any clearly defined cause, from the failure of a competent man to make the single hitch as he should and could make it, coupled with a very careless act on the part of the plaintiff, in attempting to wipe the undersurface of a half ton weight the instant after something had suggested to him the possibility of danger. So far as the master is concerned, it was the inevitable mistake which can be found now and then in the doings of the most careful and competent men, and to charge the accident to it would be to hold it an insurer. In many previous trials it had not occurred, and I am led at this moment to add one word in closing: I have taken into consideration evidence tending to show that the master has, since the accident, found a way to make assurance doubly sure, and has adopted that method. Perhaps I ought not to have admitted the evidence, but the plaintiff cannot complain. If the defendant has adopted such a contrivance, its action is humane and creditable, but by reason thereof it ought not to be punished for its former method, which was in exact harmony with the best experience of the times.

It follows that the master discharged the duty which the law imposes upon it, and the plaintiff is only entitled to nominal damages. Let judgment be entered for $25 and costs.